66 So.2d 746

**FOSTER & CREIGHTON CO. v. BOX.**
**I Div. 470.**

Supreme Court of Alabama.
June 30, 1953.

Rehearing Denied Aug. 11, 1953.

Vickers & Thornton, Mobile, for appellant.

476

Percy W. Johnston, Jr., and Johnston, McCall & Johnston, Mobile, for appellee.

PER CURIAM.

This is a suit on the common counts for certain work done by appellee, Box, for the benefit of appellant, Foster and Creighton Company, in which appellee recovered a judgment on the verdict of a jury.

The parties had a written contract for the work to be done by Box for the company. This was a subcontract. The company had a general contract to furnish all labor, tools, material, equipment, etc., necessary to construct a concrete pile wharf section for berth number 8 of marginal wharf at Alabama State Docks and Terminals at Mobile.

The particular work for which a charge is here made consists in bending the steel reinforcement rods protruding up about four feet from the top of concrete piles which supported the structure. The piles were constructed by first producing forms of the proper size and length. In these forms four steel reinforcing rods one and one-fourth inches in diameter were placed and tied with wire forming a cage to stay them in position. The concrete was then poured into and filled the forms with the end of the steel rods protruding out of the top. The piles in that condition had to be driven by the company to proper level. The end of the rods then had to be bent to level position and thereby extended into and reinforced the concrete floor and tied it to the piles. This driving could not be done after the rods were bent, but was done before that occurred. The contract between the company and the State Docks Commission required the company to do it. It was done by Box for which this suit was brought. The work was done at the request of the job superintendent of the company, and accepted by the inspector. No one else for the company authorized or directed Box to do the work.

There was also brought into question a contract between Box and Bernard and Byrd in respect to the transaction, in which it is claimed Box agreed to do this bending to be paid for by Bernard and Byrd.

The contract between Box and the company (Foster and Creighton Company) obligated Box "to furnish all labor, tools, equipment, supplies, etc., and unload and' place all reinforcing steel and accessories, as required by plans and specifications, foi a unit price of twenty-seven and 50/100 dollars ($27.50) per net ton for steel in place. All reinforcing steel, accessories and tie wire is to be furnished by others without cost to you" (appellee). It was ·further stipulated: "All terms of our general contract with the owner dated November 6, 1947, shall apply to your work under this agreement wherever they may be appliable." Nothing in it obligated Box to do the bending of the steel rods.

Bernard and Byrd also had a subcontract with the company for certain aspects of the work. It stipulated that Bernard and Byrd would "do all the work and furnish all the labor, materials, tools, machinery, equipment, facilities, supplies, etc., except as herein otherwise specified, necessary or proper for performing and completing the following work: unload reinforcing steel from cars and *fabricate* and tie this reinforcing steel into cages as shown on plans. Bernard and Byrd, Inc., will hoist and place completed cages in forms and when forms are properly adjusted R. E. Box will properly *space cages in form, hanging same to* forms as directed." In the contract between Bernard and Byrd and Box reference is made to that feature of the contract between Bernard and Byrd and the company, quoting from it what we have written *supra,* and then providing as follows: "Subcontractor (Box) shall complete the entire work (of Bernard and Byrd) in the manner and within the time hereinafter specified to the satisfaction of the architect or engineer and in accordance with the plans, specifications and drawings of the architect or engineer."

It therefore appears that neither the contract of appellant with appellee nor that with Bernard and Byrd, nor the contract of Bernard and Byrd with the company in terms obligated any of them to bend the steel rods after they had been placed and the piles driven, but that the contract between the company and the State Docks Commission required the company to do so.

■ Counsel for appellant, the company, argues that if the bending of the rods shown on the blue print was called for by either contract, then plaintiff has misconceived his remedy because the law will not imply a promise where there is an express promise, and defendant was entitled to the affirmative charge. If the contract of plaintiff with Bernard and Byrd imposed a duty on plaintiff to bend the rods in compliance with the duty of the company to the State Docks Commission, there would be no implied contract of the company by an acceptance of the work. For one doing work for a contractor under an express contract and on its sole faith is prohibited from claiming thereby an implied contract by the owner to pay him for the work by the acceptance of it by the owner. Alexander v. Alabama Western R. R. Co., 179 Ala. 480, 60 So. 295.

We concede therefore that if the obligation of Box under his contract with Bernard and Byrd was to bend the rods, and thereby included in his compensation payable by Bernard and Byrd, the company by accepting the work would not be obligated to pay for it on an implied promise. The controversy at this point, therefore, depends upon a construction of the contract between Box and Bernard and Byrd with respect to bending the rods.

But before discussing that question we will, by way of parenthesis, answer another argument of appellant's counsel. It is that the contract between Box and the company obligated Box to do the bending, for which the company expressly promised to pay Box, and therefore the common counts will not lie on an implied promise when there is an expressed one, and that under those circumstances there must be a count specially claiming for a breach of the contract to pay.

■ It is true that the breach of an executory contract to do an act must be redressed by a special count claiming for the breach, but when the contract has been performed by the plaintiff on his part, and no duty remains but the payment of the money

by the defendant, a recovery may be had on the common counts. Beadle v. Graham's Adm'r, 66 Ala. 99.

"The general rule is that, where there is an *express* contract, the plaintiff cannot resort to an *implied* one. An exception to the rule, however, is that he may recover on the common counts, although the evidence discloses a special agreement, where such agreement has been executed and fully performed, and no duty remains but the payment of the price in money by the defendant. But, so long as the contract continues executory, the plaintiff must declare specially." Jonas v. King, 81 Ala. 285, 1 So. 591, 592; St. Louis & S. F. R. R. Co. v. Hall, 186 Ala. 353, 65 So. 33; Henry v. Jefferson County, 234 Ala. 525, 176 So. 285; Standard Oil Co. v. Myers, 232 Ala. 662, 169 So. 312.

We cannot sustain the argument of counsel on that contention for the reason above stated and also because there was no agreement expressed between Box and the company, and none is claimed whereby Box was to do the bending for the compensation expressed.

We revert then to the question of whether the contract between Box and Bernard and Byrd imposed on Box that duty. If it did, he must look to Bernard and Byrd for his compensation and an acceptance of the work by the company would not under those circumstances impose an implied obligation on the part of the company.

The court in its oral charge to the jury instructed them on that question as follows:

"That brings on for your consideration that question of fact, to be determined by you from the evidence, as to whether or not, according to the plans and specifications referred to in the contract between Bernard & Byrd, Inc., and the plaintiff, Box, that he was to bend this steel in these piling. The contention of the defendant is that that was covered by the contract. And you have heard the testimony of the plaintiff and of the representative of Bernard & Byrd, as to the construction placed on that contract by them, as to the intent of the parties. And it is for you to say whether or not, after con-

struing the interpretation placed thereon by the parties to that contract, it was in fact the duty of Box to bend the steel in the piling."

There was no testimony of facts *aliunde* to aid in the interpretation of the contracts. The testimony of Box and Bernard, referred to in the oral charge, is not to that effect.

We had occasion in the recent case of Air Conditioning Engineers, Inc. v. Small, Ala.Sup., 65 So.2d 698, to review the principles and authorities which control the question of when the court must construe a contract and when it should be left to the jury. We stated the principle so carefully declared in the numerous cases cited, in substance, that the court must determine whether a contract is clear and certain, and if so declare its application, or whether it is ambiguous in its terms, and if so, but not void for uncertainty, that its meaning may be clarified by parol evidence of facts and circumstances *aliunde* and *in pais*. When so and there is such evidence it becomes the province of the jury to ascertain the truth of the evidence and draw inferences from them, and then on proper instructions interpret the contract in the light of the facts established by the evidence. The following authorities support that theory: Sewall v. Henry, 9 Ala. 24; Doe, ex dem. Holman v. Crane, 16 Ala. 570; Boykin v. Bank of Mobile, 72 Ala. 262; Lutz v. Van Heynigen Brokerage Co., 199 Ala. 620, 75 So. 284; Dozier v. Vizard Inv. Co., 203 Ala. 421, 83 So. 572; Obermark v. Clark, 216 Ala. 564, 114 So. 135, 55 A.L.R. 1153; Merchants' National Bank v. Hubbard, 220 Ala. 372, 125 So. 335; City of Birmingham v. I. E. Morris & Associates, 256 Ala. 273, 54 So.2d 555. The principle applies to verbal as well as written contracts. Swanner v. Swanner, 50 Ala. 66; Barnhill v. Howard, 104 Ala. 412, 16 So. 1.

Upon the basis of that principle, we think it was the duty of the court and not the jury to determine the meaning of the contract in question.

There is only one of the contracts here involved which it is contended imposed on plaintiff the obligation to bend the rods. That is the contract between Box and Bern-

ard and Byrd. It is that feature of it which obligates him to "unload reinforcing steel from cars and fabricate and tie this reinforcing steel into cages as shown on plans. Bernard and Byrd, Inc., will hoist and place completed cages in forms and when forms are properly adjusted R. E. Box will properly space cages in form, hanging same to forms as directed." No further duty is specified.

It is apparent that the contract binds Bernard and Byrd and Box to get the piles ready to be completed by pouring cement in the forms. That is to be done by constructing cages with the reinforcing rods; and in doing so the rods are tied with tie wire and fabricated into a cage, which is hoisted by Bernard and Byrd and set down into the forms.

The terms "fabricate," "cages" and "forms" are used in that connection. There is no evidence of the meaning of those words in trade parlance or of the process of caging. So we resort to the dictionary to aid us in that respect. The definition of "cage" in Webster's New International Dictionary includes "An inclosing or confining framework of timber or of iron and steel." The term "fabricate" is there defined as follows: "To frame, build, forge; to make, shape or prepare according to standarized specifications, so as to be interchangeable. To construct or build up into a whole by uniting interchangeable or standardized parts, often made elsewhere." And "form" is thus defined: "The shape and structure of anything."

The words of the contract to "fabricate and tie this reinforcing steel into cages as shown on plans" and "Bernard and Byrd will hoist and place completed cages in forms and when forms are properly adjusted R. E. Box will properly space cages in forms, hanging same to forms as directed," means to take the reinforcing rods and make a cage of them tied with wire, which is thereby fabricated: the cage is thus hoisted and let down into the forms in which cement is to be poured, thereby producing a reinforced concrete pile, with the ends of the rods sticking up about four feet. That completed the obligation of Bernard and Byrd, and of Box under his contract

with Bernard and Byrd, and was so regarded by them. To go further and bend those rods, numbering about six hundred and eighty-four, at an expense of about four dollars and a half for each pile, by the use of a machine made for that purpose and bought by Box is not within those contracts.

We think the trial court erroneously referred to the jury the power and duty to make an interpretation of the contracts referred to. But the verdict of the jury was favorable to plaintiff and, therefore, was consistent with our interpretation of the contracts, and neither party has cause to complain of the submission of the question to the jury.

It is also contended that if the bending cf the rods was not in the contract between Bernard and Byrd with Box, it was extra work, and as extra work the terms of the contract were not complied with. But the matter of extra work under that contract was that done for and at the instance of Bernard and Byrd. That contract did not obligate Box to have written authority from the company to do work for the company which was not called for by the contract of Bernard and Byrd with Box, nor of Box with the company. Box was under no contractual duty with the company as to extra work except as expressed in the contract between them. That contract had no such provision.

The contract for extra work, contained in the contract between the company and the State Docks Commission, regulated extra work only for which the State Docks Commission was to be chargeable. True, the contract between the company and Box provided that all the terms of the general contract with the owners (State Docks Commission) shall apply to the work of Box under their agreement wherever applicable, but it is quite clear that such provision does not serve to regulate the contractual status between Box and the company so as to prevent an agreement for work by Box not in his contract with the company or with Bernard and Byrd.

It is true under the ruling of this Court in Badders & Britt v. Davis, 88 Ala. 367, 6 So. 834, that if the owner contracted to pay

for extra work done at his request, it may be recovered although not ordered as directed by the general contract. But if he made no such promise to pay, then the presumption arises that the work was to be done without extra charge. Davis v. Badders & Britt, 95 Ala. 348, 10 So. 422.

There is also a principle that a provision in a building contract is valid and enforceable providing that extra work will not be paid for unless a claim in writing is made within a specified time to a particular person. Abercrombie & Williams v. Vandiver, 126 Ala. 513, 28 So. 491. To the same effect is the case of Roberson v. Tennessee Valley Authority, 237 Ala. 279, 186 So. 727. But that principle is not applicable to this case.

The principle is also asserted that where the owner orally orders the work, with notice that the contractor regards the work as extra and expects additional compensation, the contractor can recover though the requirement for a written order is not complied with. 66 A.L.R. 674. And this is true if the parties uniformly ignore the provision for a written order for extra work, 66 A.L.R. 675, or is waived by other circumstances. 66 A.L.R. 677.

But those principles do not here apply because Box is under no such restrictive provisions set up by contract. When we pass the contention that Box is not bound by any written contract he made to bend the steel rods, and that no contractual provision as to extra work applies between him and the company, we come to the claim that there was an implied obligation to pay for work he did at the request of defendant.

In this connection the record contains the following with reference to plaintiff's testimony as a witness examined by his counsel:

"Q. All right. Did you bend those rods? A. I bent those rods, at the request of the superintendent. * * *

"Q. All right. Now, why did you bend those rods? At whose request did you bend them? A. The superintendent of the job for Foster and Creighton, Curtis Bab.

"Q. Was Mr. Bab a superintendent for defendant, Foster and Creighton? A. Yes.

"Q. Did he direct your work in and about this job? * * * A. Yes, sir. * * *

"Q. Now, then, did that bending take place over several months' time? A. It did. In other words, as you went along you had to do this bending.

"Q. And did the defendant's superintendent—was he familiar with the fact that you were doing the work? A. He was.

"Q. The work in bending these steel rods? A. That's right.

"Q. Did Mr. Wilburn Creighton, Jr., also know that you were bending these rods? A. He did.

"Q. Mr. Box, did you have any conversation with—I'll put it this way: have you been paid for the bending of these rods? A. I have not.

"Q. How many of these steel rods could be bent in the average work day? A. In the average work day of eight hours, you could only get from 7 to 9 of those, in the run of eight hours, gentlemen. There were four to a piling.

"Q. How many people did you have working on the bending of these steel rods? A. I kept two men continuously on the rods through the job, after they once got on them. Then once in a while, when we'd catch up with them, we'd have to throw an extra two on, to do miscellaneous around the rods, to try to fill in until the other gang came along that was laying the rods under the contract. * * *

"Q. Was this work you did in bending these steel rods accepted by the inspector on the job? A. They were accepted by the inspector.

"Q. Mr. Box, during the course of this time that you were bending these steel rods, did any body tell you to stop bending them? A. No, they did not.

"Q. You were not told to stop bending the rods? A. No, sir.

"Q. When did you first make a demand for payment for your work in bending these steel rods, to Foster and Creighton? A. I talked with Mr. Creighton about the middle

part of the job, when it was about half finished. He came to me and asked me how we were getting along with the work. I told him it was getting along pretty slowly, because it was costing us a lot of money to bend these rods. We never talked about any payment until we finished with the job. * * *

"Q. I ask you, Mr. Box, did you notify the engineer or director in writing of your intention to make claim for extra compensation in this case? A. No, sir, I didn't write.

"Q. Before you began work, did you give any notice to the engineer of your intention to begin this work? A. No, sir.

"Q. Now, as soon as this work was completed did you file your claim for it with the engineer? A. No, I did not."

And on cross examination as follows:

"Q. I believe you said you didn't discuss this bending with J. P. Ewin (the engineer). A. That's right.

"Q. And I believe you also testified that you did not discuss the bending of this reinforcing with Bernard and Byrd. A. That's right.

"Q. Now, I believe you were the only steel worker on the job that had to do with the reinforcing that was put in that job. That's right isn't it? A. Yes.

"Q. Now, Bernard and Byrd paid you the full amount under the contract which had been introduced in evidence here, didn't they? A. That's right.

"Q. And Foster and Creighton paid you the full amount under the contract that has also been introduced in evidence. A. You mean what's on the paper?

"Q. Yes, sir. A. Yes."

And on redirect examination as follows:

"Q. I ask you whether on or about the 30th day of September, 1948, you furnished $195.00 worth of materials to Foster and Creighton, on the request of Mr. Babs? * * * A. I did furnish this material for the job. It was ordered by the superintendent, and I didn't see no engineer to get it confirmed, either.

"Q. And you were paid? A. And I was paid.

"Q. I ask you whether on the 24th day of September, 1948, you furnished services, labor and the services of a burner and torch, totaling the sum of $305.16? * * *. A. I did furnish them and they were authorized by the job superintendent, without the engineer's approval.

"Q. You were paid? A. I was paid for those services.

"Court: By whom? A. By Foster-Creighton."

The jury was justified in drawing the inference from this evidence that the company's superintendent on the job requested plaintiff to do the rod bending in question, and that he was authorized to bind the company and by so doing to support an implied promise by the company to pay for the reasonable value of such work, which was approved and accepted by defendant, assuming of course that plaintiff was not otherwise obligated to do the work. It is not here insisted that the superintendent had no such authority.

We do not find it necessary to analyze each assignment of error separately in connection with the foregoing discussion. Upon that basis none of them directs the Court's attention to a reversible ruling by the trial court prejudicial to appellant.

The judgment should be affirmed.

The foregoing opinion was prepared by Foster, Supernumerary Judge of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code 1940, and was adopted by the Court as its opinion.

The judgment is affirmed.

LIVINGSTON, C. J., and LAWSON, SIMPSON, STAKELY, GOODWYN and MERRILL, JJ., concur.