[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 553 
Both the plaintiff Nationwide Mutual Insurance Company ("Nationwide"), as subrogee of Friedlander Realty, Inc. ("Friedlander"), and the defendants John Hall ("Hall") and Alfa Mutual Insurance Company ("Alfa") appeal from a $102,032 summary judgment in favor of Nationwide. This case arose out of a personal injury and wrongful death action brought as a result of a fire in an apartment building owned by Hall and managed by Friedlander, in which a tenant was killed and her infant child was injured. The issues on this appeal concern the respective liability of Friedlander, Hall, and their insurers for amounts paid to settle claims brought against Hall and Friedlander by the personal representatives of the decedent mother and her child: (1)Whether an indemnity clause in the rental management agreement between Friedlander and Hall is enforceable; (2) Whether the circuit court erred in prorating between Nationwide and Alfa the amount paid to settle claims against Friedlander; and (3) Whether as the subrogee of its insured, Nationwide can bring against Alfa a claim of bad faith failure to investigate, defend, and indemnify.
Hall owns an apartment building in Mobile. In May 1986 Hall entered into a management agreement with Friedlander. Included in this management agreement was this indemnity provision:
 "Owner agrees to save agent harmless from all damage suits and claims arising in connection with said property and from all liability for injuries to persons or property while in, on, or about the premises. Owner agrees to carry, at his own expense, appropriate amounts of public liability insurance and such other liability insurance as may be reasonably applicable to this property[;] said policies shall be so endorsed as to protect agent in the same manner and to the same extent as owner. If these policies or endorsements are not furnished to agent within 10 days after execution of this agreement, coverage may be secured by agent and charged to owner, although agent does not assume this responsibility."
Presumably in accordance with this provision of the management agreement, Hall owned a contract of insurance with Alfa, which covered himself, as the named insured, and Friedlander, as "Any person . . . acting as [Hall's] real estate manager." The Alfa policy also covered Hall against all claims made against him on the basis of the indemnity agreement with Friedlander. Friedlander was covered under a policy of its own issued by Nationwide.
On April 14, 1987, a fire in the apartment building owned by Hall and managed by Friedlander caused the death of a tenant named Sheila Harris and severe injuries to *Page 554 
her minor daughter Courtney Sedeidra Harris. As administratrix of the estate of Sheila Harris and as guardian and next friend of Courtney Sedeidra Harris, Ella Mae Packer brought a wrongful death and personal injury action against Hall and Friedlander. On September 23, 1988, Friedlander sent a letter to Hall and Alfa, requesting that they provide it with a defense and indemnify. Alfa received this letter on September 29, 1988. Neither Hall nor Alfa answered this letter. Between September 23, 1988, and October 18, 1988, Friedlander made several additional, oral requests that Hall and Alfa defend and indemnify in regard to the claims alleged in the Packer action. Neither Hall nor Alfa responded to these requests. On October 18, 1988, Friedlander sent Hall and Alfa a second written request for a defense and indemnification. Again neither responded.
In accordance with its policy, Nationwide provided Friedlander with a defense, and on July 31, 1989, Nationwide entered into an agreement with Packer settling the claims against Friedlander for $250,000. The circuit court judge later approved the settlement in a prochein ami hearing, and the settlement agreement was subsequently consummated. To defend Friedlander in the Packer action, Nationwide paid $48,123 in attorney fees and $7,621 in other expenses.
Hall never responded to any of Friedlander's requests for indemnity under the management agreement. The evidence indicates that Alfa did not determine that Friedlander was covered under the Hall policy until August 21, 1989, and did not advise Friedlander that it was covered until November 28, 1989. After the settlement agreement between Packer and Friedlander was consummated on January 12, 1990, Alfa also entered into an agreement with Packer on behalf of Hall, settling the claims against Hall for $300,000, the limit of coverage under the Alfa policy.
On October 22, 1991, as subrogee of Friedlander, Nationwide brought this action against Hall and Alfa, seeking the amount it paid to settle the claims against Friedlander and the attorney fees and other expenses it paid to defend Friedlander. In its complaint, Nationwide alleged that Hall breached the indemnity provision of the management agreement. Nationwide also alleged that Alfa breached its contract of insurance with Friedlander, that Alfa negligently failed to settle the claims against Friedlander, that it wantonly failed to defend and indemnify Friedlander, and that it acted in bad faith by failing to investigate Friedlander's claim of coverage and by failing to provide Friedlander with coverage or a defense. In their answer, Hall and Alfa denied most of Nationwide's allegations and pleaded, as affirmative defenses, that Nationwide had failed to state a claim and that it had no standing as a subrogee of Friedlander to prosecute the breach-of-contract claim against Hall and the negligence, wantonness, and bad faith claims against Alfa.[1]
Nationwide moved for a summary judgment against Hall and for a partial summary judgment against Alfa. After the parties submitted sundry items of deposition, affidavit, and documentary evidence, the circuit court entered a summary judgment in favor of Nationwide on its breach-of-contract claim against Alfa. In a thorough, written judgment, the circuit court held that the Alfa and Nationwide policies both provided Friedlander with primary insurance coverage and that Alfa was obligated under its policy to contribute a pro rata share of the $250,000 paid to settle the claims against Friedlander and a pro rata share of the prejudgment interest thereon and to pay one-half of the attorney fees and other expenses paid by Nationwide to defend Friedlander and one-half of the prejudgment interest on these fees and costs. The circuit court calculated Alfa's pro rata share of the settlement and the prejudgment interest thereon based on the proportion that the limit of coverage of the Alfa policy bore to the total limit of insurance coverage applicable to the loss suffered by Friedlander. Thus, the circuit court concluded that because the $300,000 limit of coverage on the Alfa policy was 23% of the $1,300,000 total amount of insurance coverage *Page 555 
applicable to the loss, Alfa was obligated to pay $57,500 of the $250,000 settlement and $10,925 of the $47,500 in prejudgment interest thereon. The circuit court also calculated that Alfa was obligated to pay $27,571 (one-half of the $55,143 in attorney fees and other expenses) and $5,735 (one-half of the $11,470 in prejudgment interest thereon).
The circuit court also entered ex mero motu a summary judgment in favor of Hall on Nationwide's breach-of-contract claim, holding that the indemnity provision of the management agreement was unenforceable because it did not contain unambiguous language evincing an intent to indemnify Friedlander for the consequences of its own negligence. With regard to the claim of bad faith, the circuit court stated that although the evidence established a prima facie case of a bad faith failure to defend and indemnify, the circuit court entered ex mero motu a summary judgment in favor of Alfa, holding that Alabama law does not allow an insurer to bring a bad faith claim as the subrogee of its insured.[2]
The first issue is whether the circuit court erred in holding that the indemnity provision of the management agreement between Hall and Friedlander was unenforceable as a matter of law because it did not contain unambiguous and unequivocal language clearly expressing the parties' intent that Hall would indemnify Friedlander for the consequences of its own acts of negligence.
In Industrial Tile, Inc. v. Stewart, 388 So.2d 171
(Ala. 1980), cert. denied, 449 U.S. 1081, 101 S.Ct. 864,66 L.Ed.2d 805 (1981), the Court rejected the general rule that a party may not contract against the consequences of his own negligence and held that contracts against the consequences of one's own negligence are valid and enforceable if "the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify against the indemnitee's own wrongs, [and if that agreement is] expressed in clear and unequivocal language." Id.
at 175-76, modifying Alabama Great Southern R.R. v. SumterPlywood Corp., 359 So.2d 1140 (Ala. 1978). "When one seeks indemnification from another for damages that were caused by his own negligence, strict construction of the indemnity agreement against the contractor is particularly appropriate."Craig Constr. Co. v. Hendrix, 568 So.2d 752, 757 (Ala. 1990);Industrial Tile, Inc., 388 So.2d at 176.
This Court has stated that an indemnity contract purporting to indemnify for the consequences of the indemnitee's own negligence is unambiguous and, therefore, enforceable when its language specifically refers to the negligence of the indemnitee. E.g., McBro, Inc. v. M M Glass Co., 611 So.2d 283
(Ala. 1992); Industrial Tile, Inc. v. Stewart, supra. This Court, however, has also stated and held that such "talismanic" or thaumaturgic language is not necessary if the requisite intent is otherwise clear. E.g., Brown Mechanical Contractors.Inc. v. Centennial Ins. Co., 431 So.2d 932 (Ala. 1983); EastwoodLands, Inc. v. United States Steel Corp., 417 So.2d 164
(Ala. 1982); Georgia, Florida, Alabama Transportation Co. v.Deaton, Inc., 293 Ala. 371, 304 So.2d 168 (1974); Eley v.Brunner-Lay Southern Corp., 289 Ala. 120, 266 So.2d 276 (1972);Republic Steel Corp. v. Payne, 272 Ala. 483, 132 So.2d 581
(1961); see also General Television Arts, Inc. v. Southern Ry.,725 F.2d 1327, 1331 n. 6 (11th Cir. 1984) (noting that under Alabama law absence of language in indemnity agreement specifically referring to indemnitee's own negligence was not dispositive on question of enforceability); Black WarriorElectric Membership Corp. v. Mississippi Power Co.,413 F.2d 1221, 1224 (5th Cir. 1969) (applying Alabama law); Southern Ry.v. General Television Arts, Inc., 556 F. Supp. 86, 87
(N.D.Ala. 1982), appeal dismissed, 725 F.2d 1327 (11th Cir. 1984) ("The Alabama Supreme Court has stated in previous decisions that the indemnity agreement need not contain *Page 556 
'talismanic words,' i.e. the phrase 'including the negligence of the indemnitee.' "). See generally William C. Roedder, Jr.,Contractual Indemnity in Alabama, 33 Ala.L.Rev. 31 (1981).
In its judgment, the circuit court held that the indemnity provision in this case did not unambiguously express the requisite intention because its language lacked "specificity" and "certain critical language" necessary for its enforceability and because Friedlander, which drafted the agreement, had full control and authority over the management of the apartment building under the terms of the management contract. Echoing the circuit court's reasoning, Hall and Alfa argue that the indemnity provision of the management agreement lacks the "critical language" they say this Court requires for such a contract to be enforceable. Although it is not clearly stated in their briefs to this Court, the "critical language" to which they refer appears to be language specifically referring to the negligence of the indemnitee. Hall and Alfa also contend that the indemnity provision is not enforceable because, they say, Friedlander, the indemnitee, which was allegedly in control of the premises, was "actively negligent"; they argue that Friedlander, having been actively negligent, cannot seek indemnification from Hall, who they say was only "technically liable."
Nationwide argues that the indemnity provision clearly and unambiguously expresses an intention that Hall indemnify Friedlander "from all damage suits and claims arising in connection with said property and from all liability for injuries to persons or property while in, on, or about the premises." No "magic" language, Nationwide contends, is necessary for an indemnity agreement to be enforceable. Nationwide also argues that notwithstanding the provisions of the management agreement, which grant Friedlander authority to exercise full management and control over the property, it was Hall who actually installed the smoke detector in Sheila Harris's apartment that allegedly failed and caused her death and caused the injuries to her daughter Courtney Harris. Therefore, Nationwide reasons, Hall, not Friedlander, exercised the relevant control over the premises, and Nationwide thus argues that it was Hall's active negligence, not Friedlander's, that caused the injuries and the death.
We address first Alfa's argument that one in control of the premises cannot obtain contractual indemnity for the consequences of his own "active negligence" from another who is only "passively negligent" and therefore, "technically liable" for the underlying injury, damage, or loss. From the context of their argument, we gather that by their use of the term "passive negligence" Hall and Alfa mean vicarious liability, i.e., liability that the law imposes on one party for the wrongful conduct of another, as opposed to "active negligence," which they apparently use to refer to that form of liability based on one's own wrongful conduct. Although Hall and Alfa seek to insinuate these terms into the analysis germane to this issue, they cite no authority to support the alleged legal relevance of the distinction they draw between "active" and "passive" negligence.
A distinction very similar, if not identical, to the one argued by Hall and Alfa, was proposed by Justice Jones in his dissenting opinion in Industrial Tile, Inc., supra, 388 So.2d at 177 (Jones, J., dissenting, joined by Faulkner and Embry, JJ.). Justice Jones argued that the Court should distinguish liability imposed vicariously from liability imposed for one's own negligence, for purposes of deciding whether an indemnity contract purporting to indemnify one for his own negligence was enforceable. Id. The majority in Industrial Tile, Inc., however, rejected that distinction, opting instead for an intent analysis qualified by the requirement that to be sufficient any expression of intent to indemnify for the consequences of one's own negligence had to be clear and unambiguous. See id. at 175-76. We conclude, therefore, by expressly reaffirming the principle that with regard to the enforceability of indemnity agreements, the question whether the indemnitee is liable vicariously or is liable because of his own negligence is not an element of the test.
The language of the indemnity provision of the Friedlander management contract makes no specific reference to its application to the negligence of Friedlander, the indemnitee. *Page 557 
It simply states without qualification that Hall, the "Owner," agrees to indemnify Friedlander "from all damage suits and claims arising in connection with the property" and "from all liability for injuries to persons or property while in, on, or about the premises." The provision contains no language referring to the party responsible for such "damage suits," "claims," or "liability." It is this allegedly "critical language," i.e., language specifically referring to the negligence of the indemnitee, or, more generally, the lack of "specificity" which, according to Hall and Alfa, makes the provision unenforceable. We reiterate, however, that talismanic or thaumaturgic language, such as a specific reference to the negligence of the indemnitee, is not necessary if the requisite intent is otherwise clear. Brown Mechanical Contractors, 431 So.2d at 945.
Reading the indemnity provision and the management contract as a whole, we conclude that Friedlander and Hall expressed in clear and unambiguous language an intention that Hall would indemnify Friedlander for all liability for damages arising from property damage in connection with the management of the apartment building and for all liability for personal injury suffered on the premises of the apartments. The provision is not made ambiguous merely because it did not expressly provide that the language "all damage suits and claims" and "all liability" included suits, claims, or liability arising from Friedlander's own negligence. That the indemnity provision also obligated Hall to carry public liability insurance protecting Friedlander to the same extent as it protected Hall further supports our conclusion that the parties intended that Hall would indemnify Friedlander fully from all liability arising from Friedlander's management of the apartment building.
Moreover, nothing in the record indicates or suggests that the parties did not knowingly, evenhandedly, and intelligently enter into this agreement. The Friedlander management agreement is less than two pages long, and the indemnity provision is printed on the first page. Hall and Friedlander are in the business of commercial real estate investment and management, and nothing in the record indicates that Hall was unsophisticated or that he was unable to obtain the advice of counsel. One consideration of public policy implicitly supporting the rule requiring that indemnity contracts be clear and unambiguous is the idea that the indemnitor should be aware of the obligation he contractually assumes. The language of the agreement and the nature of the parties to this contract give us no reason to conclude that they did not knowingly and evenhandedly enter into this contract. Therefore, we hold that the circuit court erred in holding that the indemnity provision of the Friedlander management agreement was unenforceable.
The second issue is whether the circuit court erred in prorating the amounts that Nationwide and Alfa are obligated to contribute to the settlement of the claims against Friedlander.
Both Nationwide and Alfa appeal from the circuit court's judgment prorating their contributions to the $250,000 settlement according to the respective limits of coverage of the Nationwide and Alfa policies. Nationwide argues that under the terms of its policy, it is an excess insurer and, therefore, that Alfa, as the primary insurer, is liable for the entire amount of the settlement, the attorney fees and other expenses, and the interest. Nationwide contends that it is liable only for any liability in excess of the $300,000 limit of coverage under Hall's Alfa policy.
Citing United States Fire Ins. Co. v. Hodges, 275 Ala. 243,154 So.2d 3 (1963), Alfa argues that because under its policy Friedlander is an "additional insured," and not a "named insured," the insurance coverage applicable to Friedlander is excess, and not primary. Alfa insists that its coverage is primary only as to Hall, the "named insured" under its policy. Therefore, Alfa contends that because the amount of the settlement with Packer did not exceed the $1,000,000 limit of coverage under the Nationwide policy, Alfa has no obligation, as an excess insurer, to contribute. Alfa also argues that the absence of an "other insurance" clause shows that Nationwide did not attempt to limit its liability in the event other insurance covered the same risk and that, therefore, Nationwide *Page 558 
is liable for the entire loss without contribution from Alfa.
We consider first whether Nationwide and Alfa are both primary insurers or whether one is a primary insurer and the other is an excess insurer. In its judgment, the circuit court concluded that Nationwide and Alfa were both primary insurers. We agree.
The determination of which insurance coverage is primary and which, if any, is excess or secondary depends on the exact language of the policy. Isler v. Federated Guaranty Mut. Ins.Co., 567 So.2d 1264, 1265 (Ala. 1990); see Gaught v. Evans,361 So.2d 1027 (Ala. 1978); Protective National Ins. Co. of Omaha v.Bell, 361 So.2d 1058 (Ala. 1978). Insurance contracts, like other contracts, are construed to give effect to the intention of the parties, and when that intention is clear and unambiguous, the insurance policy must be enforced as written.Wakefield v. State Farm Mut. Auto. Ins. Co., 572 So.2d 1220
(Ala. 1990). In determining the intention of the parties, "the court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions, in order to arrive at the true intent of the parties." StateFarm Mut. Auto. Ins. Co. v. Lewis, 514 So.2d 863, 865
(Ala. 1987); see Turner v. United States Fidelity Guar. Co.,440 So.2d 1026 (Ala. 1983). If an action involves a dispute between two or more insurers and if the court concludes that an insurance contract is ambiguous concerning a condition of, an exclusion from, or a limitation on, coverage or liability, it must construe the ambiguity against the insurer that drafted the policy. See Home Indem. Co. v. Employers Nat'l Ins. Corp.,564 So.2d 945, 947 (Ala. 1990); Commercial Standard Ins. Co. v.General Trucking Co., 423 So.2d 168, 171 (Ala. 1982).
The record includes certified copies of both the Nationwide policy and the Alfa policy.[3] We examine the Alfa policy first.
Coverage of Hall and Friedlander under the Alfa policy is based on the following provisions:
"SECTION II — WHO IS AN INSURED
"1. If you are designated in the Declarations as:
 "a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
". . . .
"2. Each of the following is also an insured:
". . . .
 "b. Any person (other than your employees), or any organization while acting as your real estate manager."
The "Other Insurance" provision of the Alfa policy states in pertinent part:
 "SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS
". . . .
"4. Other Insurance
 "If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:
"a. Primary Insurance
 "This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
"b. Excess Insurance
 "This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis: *Page 559 
 "(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work';
 "(2) That is Fire insurance for premises rented to you; or
 "(3) If the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).
 "When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or 'suit' that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's right against all those other insurers. When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
 "(1) The total amount that all such insurance would pay for the loss in the absence of this insurance; and
 "(2) The total amount of all deductible and self-insured amounts under all that other insurance.
 "We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part."
The language of this "Other Insurance" provision clearly states that coverage under the policy is primary unless one of the three exceptions applies. Because none of these exceptions applies in the circumstances of this case, we conclude that the Alfa insurance is primary as to Friedlander as well as to Hall.
Notwithstanding the clear language of its policy, Alfa contends that its coverage of Friedlander is excess because Friedlander is what Alfa calls an "additional insured" under its policy, as distinct from what Alfa calls a "named insured." In support of this argument, Alfa cites United States Fire Ins.Co. v. Hodges, supra, wherein the Court stated:
 "The lower court conceded, and we agree, that there is a diversity of opinion on this question in other jurisdictions, but we adopt the rule that 'other' or 'double' insurance under those provisions exists only where there are two or more insurance policies covering the same interest, the same subject matter and against the same risk; and that the 'other' insurance clause in the policies referred only to other insurance taken out by the insured named in that policy."
275 Ala. at 248, 154 So.2d at 7 (emphasis added). Relying heavily on this emphasized language, Alfa argues that because Friedlander is not an "insured named in [its] policy," there is no "double insurance" and the "other insurance" provision of the Alfa policy is not triggered. Based on this reasoning, Alfa contends that as an additional insured, Friedlander is, therefore, entitled only to excess coverage under its policy.
This argument is unsupported either by this Court's decision in Hodges or by logic.[4] Close examination of the facts and the holding in Hodges shows that the language Alfa emphasizes does not "carry the water" that Alfa says it does. In affirming the trial court's decision not to prorate liability between two insurance policies, the Hodges Court held only that because the entities or persons insured by the two policies involved in the case were not the same, there was no double insurance to trigger the "other insurance" clauses of the policies. By contrast, in this case, Friedlander is both a "named insured" or "insured" under the Nationwide policy and an "insured" under the Alfa policy as defined by its provisions. Furthermore, the Alfa "other insurance" provision makes no distinction between "named insureds" and "additional insureds"; it applies simply to "other valid and collectible insurance . . . available tothe insured."
Moreover, Alfa's entire argument here is a non sequitur. Alfa argues that because Friedlander is not a "named insured" under its policy, no double insurance exists to trigger *Page 560 
the "other insurance" clause of its policy and that, therefore, the insurance coverage of Friedlander under its policy is excess, and not primary. However, no issue of whether insurance is primary or excess even arises if double insurance does not exist. The concepts of "primary" and "excess" merely define the extent of an insurer's liability to its insured when its insured has other insurance covering the same interest, subject matter, and risk. To say that no double insurance exists completely eliminates the question whether the insurance coverage in question is primary or excess. In sum, the argument based on the use in Hodges of the phrase "named insured" does not establish that Alfa's coverage of Friedlander is excess.
We conclude, therefore, that Alfa's arguments that the coverage afforded to Friedlander under its policy is excess, and not primary, have no merit.
We turn now to the Nationwide policy. The certified copy of Friedlander's Nationwide policy in the record includes "Comprehensive General Liability Insurance," "Premises Medical Payments Insurance," and various endorsements applicable to each; however, it contains no "other insurance" clause. Because the Nationwide policy does not state whether it is primary or excess insurance, it is ambiguous and must be construed.
Despite the absence of an "other insurance" clause or some other general provision stating whether coverage is primary or excess, several policy provisions of the Nationwide policy stipulate that certain parts or aspects of the "Comprehensive General Liability Insurance Coverage" are excess or are contingent upon the absence of other valid and collectible insurance either on a primary or on an excess basis:
"II. PERSONS INSURED
 "Each of the following is an insured under this insurance to the extent set forth below:
". . . .
 "(e) with respect to the operation for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law,
 "(i) an employee of the Named Insured while operating any such equipment in the course of his employment, and
 "(ii) any other person while operating with the permission of the Named Insured any such equipment registered in the name of the Insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization."
 "BROAD FORM COMPREHENSIVE GENERAL LIABILITY ENDORSEMENT
". . . .
"V. FIRE LEGAL LIABILITY COVERAGE — REAL PROPERTY
 "With respect to property damage to structures or portions thereof rented or leased to the named insured, including fixtures permanently attached thereto, if such property damage arises out of fire
 "(A) All of the exclusions of the policy, other than the Nuclear Energy Liability Exclusion (Broad Form), are deleted and replaced by the following:
 "This insurance does not apply to liability assumed by the insured under any contract or agreement.
 "(B) The limit of property damage liability as respects this Fire Legal Liability Coverage — Real Property is $50,000 each occurrence unless otherwise stated in the schedule of this endorsement.
 "(C) The Fire Legal Liability Coverage — Real Property shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage and Other Insurance Condition of the policy is amended accordingly.
". . . . *Page 561 
"VI. BROAD FORM PROPERTY DAMAGE LIABILITY COVERAGE
 "(Including Completed Operations) "The insurance for property damage liability applies, subject to the following additional provisions:
". . . .
 "(B) The Broad Form Property Damage Liability Coverage shall be excess insurance over any valid and collectible property insurance (including any deductible portion thereof) available to the insured, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage, and Other Insurance Condition of the policy is amended accordingly."
"HIRED AUTOMOBILE AND NON-OWNED
"AUTOMOBILE LIABILITY INSURANCE ENDORSEMENT
"HIRED AUTOMOBILE LIABILITY
 "The insurance applies to bodily injury or property damage arising out of:
 "The maintenance or use of hired automobiles in the business of the named insured by the named insured
or an employee of the named insured.
". . . .
 "4. The 'Other Insurance' condition is replaced by the following:
 "The insurance afforded by this endorsement shall be excess insurance over any other valid and collectible insurance available to the insured."
(Emphasis added.) Reading these provisions in the context of the whole contract and construing the contract against Nationwide, the insurer that drafted it, we conclude that the Nationwide policy is a policy of primary insurance, except when otherwise specifically stated to apply in excess of or in the absence of other insurance. The provisions quotedsupra clearly state exceptions to what is otherwise primary coverage.
Because we have concluded that both the Alfa policy and the Nationwide policy provide primary insurance to Friedlander, the issue becomes whether the circuit court properly adjudicated the insurers' respective obligations to pay pro rata portions of the Friedlander settlement.
When two or more insurance carriers have primary insurance coverage of the same insurable interest, subject matter, and risk, they share liability in accordance with the proportion that the limits of each policy bear to the total limit of insurance applicable to the loss. See State Farm Mut. Auto.Ins. Co. v. General Mut. Ins. Co., 282 Ala. 212, 210 So.2d 688
(1968) (adopting Lamb-Weston rule); see also Lamb-Weston, Inc.v. Oregon Auto. Ins. Co., 219 Or. 110, 341 P.2d 110, modifiedand rehearing denied, 219 Or. 129, 346 P.2d 643 (1959). See generally 44 Am.Jur.2d Insurance, § 1792, at 780 (1982).
Alfa raises two issues with regard to the circuit court's judgment prorating the liability for the settlement of Friedlander's claim and the related costs of defense. The first is whether Nationwide had a cause of action for contribution from Alfa when Nationwide's policy had no "other insurance" clause. Alfa contends that by not including an "other insurance" clause in its policy, Nationwide did not contractually limit its liability in the event other insurance covered the same risk; therefore, Alfa argues that Nationwide, as a primary insurer, must pay the entire loss without contribution from Alfa.
Although property and casualty and other types of insurance policies customarily contain "other insurance" clauses and although it is the rare case, such as this one, when one does not, the absence of an "other insurance" clause does not necessarily preclude apportionment of liability among insurance policies covering the same risk. It is well established, although seldom litigated now, that if an insurer has paid theentire amount of a loss, that insurer may seek contribution from other insurers liable for the same risk, even though the policy of the insurer seeking pro rata contribution contains no provision for apportionment of liability. 2 Warren Freedman,Richards on Insurance § 175, at 637 (5th ed. 1952); 4 Joseph A. Joyce, A Treatise on the Law of Insurance of Every Kind § 2491, at 4165 (2d ed. 1918); see also Home Ins. Co. v. BaltimoreWarehouse Co., 93 U.S. 527, 546, 23 L.Ed. 868 (1876). This right to contribution is based on the principle that the paying *Page 562 
insurer paid a debt owed by another, concurrently liable insurer. Freedman, Richards on Insurance § 175, at 637.
The second issue Alfa raises with regard to the judgment prorating liability is whether the circuit court erred in requiring Alfa to contribute pro rata to the settlement of the claims against Friedlander and the related legal costs and expenses after Alfa had exhausted its policy limits in settling the claim against Hall.
In its judgment, the circuit court held:
 "When an insurer with knowledge of more than one adverse claim pays its limits to one of the claimants, it does so at its own risk and, notwithstanding such payment, will be held liable to the other claimant. See Gray v. Holyoke Mut. Fire Ins. Co., 293 Ala. 291, 302 So.2d 104 (1974). Because Alfa knew that it owed coverage and a defense to Friedlander, knew that it had breached its contract with Friedlander by failing to provide Friedlander with coverage and a defense before Nationwide settled the claims against Friedlander, knew that Nationwide had paid $250,000 to settle the claims against Friedlander, and knew that Friedlander was claiming indemnity from Hall (to whom Alfa owed contractual liability coverage) when Alfa made the decision to pay its limits of $300,000 to settle the claims of the Packer plaintiffs against Hall, Alfa cannot assert exhaustion of its limits as a defense to Nationwide's claim [for contribution against Alfa]."
In its brief Alfa argues that because it had already paid $300,000, the limit of its policy, to settle the claims against its named insured Hall, it could not be liable for any pro rata contribution to the amount paid by Nationwide to settle the claims against Friedlander.
When prorating liability in accordance with the policy limits of two or more insurance policies covering the same insurable interest, subject matter, and risk, an insurer generally should not be compelled to contribute more than the limits fixed in its policy. 16 Mark S. Rhodes, Couch Cyclopedia of InsuranceLaw, § 62:15, at 447 (1983). However, when, as in this case, an insurer insures two or more parties for the same insurable interest, subject matter, and risk and when it pays the limits of its policy to one of its insureds with notice of an adverse claim by another, the insurer does so at its own risk and may be liable to another insurer of its insured for a pro rata contribution, notwithstanding the limits of its policy. SeeGray v. Holyoke Mut. Fire Ins. Co., 293 Ala. 291, 302 So.2d 104
(1974). See generally 4 Couch on Insurance, § 27:177, at 889. We hold, therefore, that because the record undisputedly shows that Alfa knew of Friedlander's claim for indemnification long before it paid the entire proceeds of its policy to settle the claims against Hall, the circuit court properly held Alfa liable to Friedlander's other insurer, Nationwide, for a pro rata contribution to the amount Nationwide paid to settle the claims against Friedlander and the cost of conducting Friedlander's defense, even though Alfa had already paid the limits of the policy covering both Hall and Friedlander in settlement of the claims against Hall.
The third issue is whether under Alabama law an insurer, as the subrogee of its insured, may bring a claim of bad faith against another insurer. Although the circuit court concluded that sufficient evidence had been presented to establish a claim that Alfa had in bad faith failed to defend and indemnify, it held that Alabama law does not allow an insurer to bring such a claim as the subrogee of its insured.
Citing Fireman's Fund Ins. Co. v. Continental Ins. Co.,308 Md. 315, 519 A.2d 202 (1987); Continental Cas. Co. v. ReserveIns. Co., 307 Minn. 5, 238 N.W.2d 862 (1976); Home Ins. Co. v.Royal Indem. Co., 68 Misc.2d 737, 327 N.Y.S.2d 745 (N.Y. Sup. Ct.), affirmed, 39 A.D.2d 678, 332 N.Y.S.2d 1003, appeal denied, 31 N.Y.2d 641, 289 N.E.2d 565, 337 N.Y.S.2d 1025
(1972), Nationwide urges this Court to follow those cases and hold that as the excess insurer and subrogee of Friedlander, it may bring a claim of bad faith against Alfa, Friedlander's primary insurer.
We recognize that a number of courts in other jurisdictions have recognized that a primary insurance carrier owes a duty of *Page 563 
good faith to an excess insurance carrier of its insured and on that basis have allowed an excess insurer to bring a claim of bad faith against a primary insurer. Hartford Accident Indem.Co. v. Aetna Cas. Surety Co., 164 Ariz. 286, 792 P.2d 749,752-53 nn. 2-3 (1990) (survey of jurisdictions). See generally Excess Carrier's Right to Maintain Action AgainstPrimary Liability Insurer for Wrongful Failure to Settle ClaimAgainst Insured, 10 A.L.R.4th 879 (1981). A few courts have even recognized a direct duty owed by a primary insurer to an excess insurer and have permitted excess insurers to bring claims of bad faith against primary insurers without being limited to asserting rights as subrogees of their insureds. E.g., Hartford Accident Indem. Co. v. Michigan Mut. Ins. Co.,93 A.D.2d 337, 462 N.Y.S.2d 175 (1983), affirmed, 61 N.Y.2d 569, 463 N.E.2d 608, 475 N.Y.S.2d 267 (1984); Estate of Penn v.Amalgamated General Agencies, 148 N.J. Super. 419, 424,372 A.2d 1124, 1127 (1977). See generally Annotation, LiabilityInsurance: Excess Carrier's Right of Action Against PrimaryCarrier for Improper or Inadequate Defense of Claim, 49 A.L.R.4th 304 (1986).
One factual premise of this cause of action, however, is that the insurer bringing the claim is an excess insurer of the insured. Because Nationwide's insurance is primary, and not excess, we do not address the merits of this issue.
Based on the foregoing, we reverse that portion of the summary judgment in favor of Hall on the claim of breach of a contract of indemnity; affirm that portion awarding Nationwide $102,032.33 on its claim for contribution from Alfa; and affirm that portion in favor of Alfa on the claims alleging bad faith failure to investigate, defend, and indemnify.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and SHORES, KENNEDY, INGRAM and COOK, JJ., concur.
HOUSTON, J., concurs in part, concurs in the result in part, and dissents in part.
[1] Hall and Alfa later amended their answer to assert the affirmative defense of the statute of limitations; however, no issue regarding this affirmative defense is raised by either party to this appeal.
[2] The circuit court's judgment does not mention Nationwide's alleged subrogated claims of negligence and wantonness; however, because the written judgment shows that the circuit court sought to adjudicate the entire cause, we conclude that it entered summary judgments on them in favor of Alfa. Nationwide does not argue for reversal of the summary judgment for Alfa on these claims; therefore, Nationwide has waived any issue as to them and the judgment on these claims is affirmed.
[3] As part of an appendix to its reply brief to this Court, Alfa attached a certified copy of the Nationwide policy issued to Friedlander, which, Alfa alleges, was filed in a declaratory judgment action filed by Nationwide against Friedlander in the United States District Court for the Southern District of Alabama. This copy of the Nationwide policy contains provisions that are not in the certified copy included in the record. We will not consider these provisions, which were not before the trial court. We have, therefore, granted Nationwide's motion to strike this appendix.
[4] We note also that authority cited by the Hodges Court in support of the rule quoted from Hodges does not support the distinction Alfa attempts to make.